**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **STEVEN M. JOHNSON,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **Civ. No.: MJM-25-0374** |
| **MARYLAND DIVISION OF CORRECTIONS,** ***et al.*****,** | * | |
| **Defendants.** | * | |

* * * * * * * * * *

# MEMORANDUM OPINION

Self-represented plaintiff Steven M. Johnson initiated this civil rights action by filing a complaint pursuant to 42 U.S.C. § 1983, which he later amended, against Maryland Division of Correction; Centurion of Maryland, LLC; Darryl Hill, M.D.; Medical Director for Jessup Correctional Institution ("JCI") Nana Aba Agyei-Kyeremateng; Optician John Doe; Physician's Assistant Adane Negussie; "Pain Doctors"; Deputy Secretary for Department of Public Safety and Correctional Services ("DPSCS") Renard Brooks; Commissioner of Corrections J. Phillips Morgan; Warden of JCI Damien Stewart; and Joey Hudson (collectively, "Defendants").[1] ECF No. 7.[2] On February 20, 2026, Centurion of Maryland, LLC, Darryl Hill, M.D., Nana Aba Agyei

[1] The Clerk will be directed to amend the docket to reflect the full and correct spelling of Defendants' names.

[2] Johnson also filed a Motion to Add Defendants (ECF No. 13) wherein he sought to add Ashok Krishnaswamy, M.D. as a defendant. Johnson asserts that the surgery on his rotator cuff was not successful, the wound did not heal property, and he was supposed to return to the doctor for follow-up but that did not happen. *Id.* at 1. "[A] request to amend should only be denied if one of three facts is present: 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile.'" *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012) (quoting *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009)). Here the request to amend is futile because Johnson fails to allege sufficient facts to demonstrate that Dr. Krishnaswamy, even if he was determined to be a state actor, was deliberately indifferent to his serious medical need. Johnson's claims that his surgery was unsuccessful and Dr. Krishnaswamy was responsible for the difficulty in his wound healing and/or responsible for scheduling follow up

Kyeremateng, and Adane Negussie (collectively, "Centurion Medical Defendants") filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 27. On April 29, 2026, Damean Stewart, J. Philip Morgan, Renard Brooks, and the Maryland Division of Correction (collectively, the "State Defendants") filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF No. 40. Johnson has opposed the motions (ECF Nos. 34, 42)[3] and has filed Motions to Appoint Counsel, which he supplemented. ECF Nos. 14, 20, 29, 30. State Defendants filed a reply.

---

care, amount to nothing more than negligence. Johnson has failed to allege any facts to demonstrate deliberate indifferent on the part of Dr. Krishnaswamy.

[3] Johnson filed a document titled "Motion to Dismiss Summary Judgment" which amounts to a response in opposition to Centurion Medical Defendants' dispositive motion. ECF No. 34. Thereafter, he filed a "Motion to Deny Dismissal" (ECF No. 44) in response to State Defendants' dispositive motion, which State Defendants move to strike as an unauthorized surreply (ECF No. 45). He then filed a "motion to deny Rule 12 Dismiss/or Strike as Defendants (ECF No. 46) wherein he reiterates his opposition to Defendants' dispositive motions. Centurion Medical Defendants move to strike this motion as an unauthorized surreply. ECF No. 49. The motions to strike shall be granted as no party is entitled to file a surreply unless otherwise ordered by the Court. *See* Local Rule 105.2(a) (D. Md. 2025). A surreply is most often permitted when the moving party must respond to matters raised for the first time in a reply. *See Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001). Johnson was not directed to file a surreply, and the Court does not find that Johnson's filings addressed matters raised for the first time in State Defendants' reply.

Johnson also filed a document that was docketed as "Motion for Sanctions" wherein he complains that legal materials have been deleted from his tablet preventing him from prosecuting his case. ECF No. 50. He explains that he can only go to the library once a week and that he is limited in his ability to access computers and other materials. *Id*. at 1. Johnson asks that the Division of Correction be ordered to reproduce his ARP or provide him representation because they blocked his "Legal App" and he can only access it on Monday afternoons due to his work schedule. *Id*. The motion is denied as Johnson was able to file responses to Defendants' dispositive motions. If he believes his rights have been violated due to the deletion of items from his tablet, he may file a new civil rights complaint detailing those claims.

Lastly, Johnson filed a document titled "Supplement to [ECF] 7 Amended Complaint." ECF No. 47. The filing consists of administrative remedies Johnson filed concerning his medical care. Centurion Medical Defendants move to strike the filing as an unauthorized amendment. ECF No. 51. Federal Rule of Civil Procedure 15(a) provides that "[a] party may amend its pleading once as a matter of course no later than 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." After the expiration of that 21-day window, or after the party has exercised its right to amend once as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id*. Additionally, "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Johnson has not sought the Court's permission to amend or supplement his Amended Complaint and provides no argument in support of the proposed supplement. The filing appears to be futile because it does not explain how the additional documents relate to the claims previously asserted. As such, the Court does not find that justice requires permitting the supplement. Because the supplement was filed improperly, without a motion, Centurion Medical Defendants' Motion to Strike is granted.

ECF No. 43. The issues have been fully briefed. The Court finds no need for a hearing in this matter. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated below, Johnson's Motions to Add Defendants and to Appoint Counsel shall be denied, State Defendants' motion to dismiss is granted, and Centurion Medical Defendants' motion, treated as a motion for summary judgment, is also granted.[4]

## I. BACKGROUND

### A. Plaintiff's Allegations

In his Amended Complaint, Johnson asserts that he has been denied constitutionally adequate medical care in several ways. In general, he asserts that DPSCS does not do anything about his complaints and instead "rubber stamps" what the medical providers say without investigation. ECF No. 7 ("Am. Compl.") at 9. He also claims that whenever he files an ARP about his medical issues, he is moved to a different institution in retaliation for his complaints. *Id.* at 11. As relief, he seeks cataract surgery, an MRI and surgery on his shoulder, access to the Veterans Administration for medical care, and punitive damages. *Id.* at 7, 13. As to his specific medical issues, Johnson explains the following:

#### 1. Shoulder Injury

Johnson states he suffered a torn rotator cuff, but "they" claim it is "frozen shoulder" and refuse to schedule an MRI that was recommended in 2021 due to the cost. Am. Compl. at 6. Before Centurion took over the contract to provide medical services at DPSCS facilities, he received corticosteroid injections in his shoulder, but Centurion refused to continue the injections. *Id.* at 6, 9. Johnson cannot move or raise his arms without extreme pain which extends to his back and

[4] Joey Hudson and the unnamed optician and "Pain Doctors" have never been identified or served with the Complaint. Because the Complaint fails to state a claim against these defendants, the Complaint shall be dismissed as to each of them pursuant to 28 U.S.C. §§ 1915, 1915A.

hurts his legs. *Id.* at 8. On an unspecified date, Dr. Hill advised him that he had frozen shoulder syndrome, not a torn rotator cuff, and refused to order an MRI to verify the diagnoses. *Id.* Johnson states a frozen shoulder is the same as a torn rotator cuff, but Dr. Hill denied him an injection for his shoulder claiming that it does not do anything for pain. Johnson maintains that "paperwork" for frozen shoulder recommends an injection and he has previously received injections from other providers. *Id.* at 6, 9. Johnson submitted sick calls but was advised that there was nothing they could do for him. He has been provided BioFreeze muscle rub, but it provides only temporary relief. *Id.*

Dr. Hill sent Johnson to a pain doctor. *Id.* at 9. Johnson again requested an injection but was advised that "they do not believe in them." *Id.* The doctors asked about Neurontin, which Johnson had been taking, and discussed prescribing Lyrica but stated that if they started Johnson on Lyrica, they would have to start at a low dose and gradually increase the dose. *Id.* They suggested increasing his dosage of Neurontin as an alternative but "stopped [his] Neurontin because [he] would not take the Lyrica instead." *Id.* Ultimately, a nurse renewed his prescription. *Id.* Johnson states that he is in constant pain, but DPSCS and Centurion refuse treatment. *Id.* at 11.

**2. Eye Care**

The optometrist at Western Correctional Institution diagnosed Johnson with cataracts in both eyes, but when he was transferred to Eastern Correctional Institution, he was told he had to wait until he was released to get both eyes treated. *Id.* at 11. Johnson claims he underwent cataract surgery on his right eye in 2023, but DPSCS and Centurion refuse to do the surgery on his left eye because there is a "One Eye Policy" adopted to save money. *Id.* at 6, 11. Johnson states that his right eye closes all the time, and he was advised that the cataract surgery would resolve that issue, but JCI did not tell the hospital about his right eye closing. *Id.* at 6, 11. It hurts to keep the eye

open, and he gets headaches. *Id.* at 6, 11. Because he has not had the surgery, he hits his head on the shelf in his cell because he cannot see it. *Id.*

**3. Podiatry**

Johnson suffers from flat feet. *Id.* at 6. It has been recommended that he receive special shoes and inserts since 2021. *Id.* He was measured for special shoes, but the order was cancelled. Before Centurion took over the medical contract, Johnson received corticosteroid injections in his feet, but Centurion has also refused to continue these injections. *Id.* Centurion and Dr. Hill "do not believe in [the injections] for [Johnson's] feet and shoulder." *Id.* Johnson's feet hurt and go numb. *Id*. at 7.

Johnson states that medical providers and JCI staff have refused to provide him with proper footwear. *Id.* at 9. Podiatrist Dr. Berger placed an order for Johnson to go to Hanger, a specialty store that deals with orthotics, but instead he has been provided off-the-shelf shoes that make his feet sore and bleed. *Id.* When he takes off his shoes, his feet are numb, and he has difficulty walking. *Id.* Johnson has made several requests to JCI personnel for proper shoes. Medical provided him with black shoes that wore the skin off his feet, and Dr. Berger instructed him not to wear them again. *Id.* Johnson was advised that if he wanted proper footwear, he needed to go to medical because JCI was not going to provide them; all he was offered were diabetic shoes. *Id.* Johnson explains that he ordered shoes from a catalogue, which helped a little, but his feet still hurt. *Id.* He also claims that he has been denied the opportunity to purchase his own shoes. *Id*. at 8. Johnson received injections in his feet for over 25 years, but Dr. Hill claims they are no good. *Id*.

Dr. Berger treated Johnson until Centurion took over the medical contract, and they refused to hire a podiatrist. Instead, Johnson was sent to Johns Hopkins to see a podiatrist, but the podiatrist

was scared to examine Johnson, and the doctor only spent seven-to-eight minutes with him before rushing out. *Id*. at 6. Even the escorting officer advised Johnson that the trip was a waste, and he would have been better off at Hanger. *Id*. at 7. The podiatrist prescribed Johnson Mobic, to which he is allergic; had the doctor consulted his medical records he would have noted the allergy. *Id*. at 7, 11. The doctor refused to provide him with orthotics or injections. *Id*. at 7.

**B. Centurion Medical Defendants' Response**

Centurion Medical Defendants have provided relevant portions of Johnson's medical records. ECF Nos. 27-3, 27-4. They contend that Johnson's medical records demonstrate he has a significant history of diabetes, frozen shoulder syndrome, flat feet, GERD, and cataracts. *Id*. Centurion of Maryland, LLC's contract with DPSCS to provide medical care to state inmates began on August 1, 2024. Before that, YesCare was the medical care provider. *See* ECF No. 27-2 at 2 n.4.

**1. Johnson's Medical Care Prior to Centurion**

On July 2, 2023, Johnson underwent intake processing at JCI, where he had just been transferred, which included an initial medical screening. ECF No. 27-4 at 37–38.

Johnson was seen by nursing staff during sick call on July 4, 2023, for his complaints of stomach pain and diarrhea. He was prescribed Pepto Bismol and referred to a provider. ECF No. 27-4 at 35–36. On July 8, 2023, Johnson was seen by a provider for management of his chronic medical conditions. *Id.* at 30. He also sought information regarding assurances made to him at another facility and was scheduled to be seen by the onsite provider about his concerns. *Id*. The following day, he was seen by an onsite provider regarding continued assessment of his chronic health conditions, medication compliance, and treatment plan. *Id.* at 23–29.

**a. Shoulder Injury**

On July 11, 2023, the provider evaluated Johnson due to his complaints of left shoulder pain, which he attributed to a 2015 rotator cuff injury. ECF No. 27-4 at 18. Johnson was directed to continue his current pain management regimen and follow-up with his chronic care provider. *Id.* at 18–21. On July 13, 2023, Johnson presented at sick call with complaints of left shoulder pain, and it was noted that he had been seen for these same complaints on July 9. *Id.* at 16–17. Johnson had a scheduled nurse visit for complaints of left shoulder pain on August 15, 2023. No swelling or redness was observed, and he tolerated minimal active range of motion. *Id.* at 5. Johnson was advised to continue his pain management regimen. *Id.* He did not appear for scheduled medical visits on August 21 and 24, 2023. *Id.* at 3–4. On August 28, 2023, a nurse evaluated Johnson again for left shoulder pain and referred him to a provider for further evaluation and treatment. *Id.* at 1–2. On August 31, 2023, the provider saw Johnson and ordered an x-ray of the left shoulder. ECF No. 27-3 at 743–49.

Johnson had a chronic care visit on December 28, 2023. ECF No. 27-3 at 609. He noted continued chronic pain in his left shoulder, which was well controlled with his prescribed medication. *Id.*

Johnson was next seen regarding his shoulder pain on February 1, 2024, and his topical pain medication was refilled. ECF No. 27-3 at 587–89. On February 17 and 19, 2024, he was seen regarding left shoulder pain and weakness and referred to the onsite provider. *Id*. at 565–69. Johnson reported to medical on February 20, 2024, and asked to be seen by his chronic care provider, and he was told to place a provider sick call. *Id*. at 560–65. Johnson had a chronic care visit on February 22, 2024, and his conditions were reviewed. *Id*. at 552–55. On March 18, 2024, nursing staff examined Johnson for complaints of right shoulder pain and referred him to a provider. *Id.* at 535–36. On March 26, 2024, an orthopedic doctor examined Johnson for

complaints of bilateral shoulder pain and provided a steroid injection in his right shoulder. *Id.* at 517–20.

On April 1, 2024, due to Johnson's continued complaints of right shoulder pain, he was referred to the pain management committee and educated on self-care practices, including lifestyle modification and alternative pain management such as hydration, stretching of muscles, tendons, ligaments, and back strengthening exercises. ECF No. 27-3 at 508–12. Johnson indicated his understanding, *see id.*, but he was seen again the following day for complaints of chronic pain, where the nurse noted he had been seen the day before. *Id.* at 499–500.

On April 5, 2024, the provider saw Johnson again due to his complaints of chronic pain, and gave him BioFreeze for pain management, in addition to the Neurontin, which had previously been prescribed. ECF No. 27-3 at 490–93. On April 9, 2024, Johnson was evaluated for muscle spasm and pain, and it was noted that he had been seen for the same complaints on April 4. *Id*. at 483. On April 18, 2024, he was seen for complaints of right shoulder pain and referred to a provider for evaluation. *Id.* at 469–70.

Johnson had a chronic care visit on June 24, 2024, and his conditions were found to be stable. ECF No. 27-3 at 437–41.

On July 16, 2024, the provider saw Johnson for complaints of shoulder pain. ECF No. 27-3 at 421–34. A consultation for orthopedics was placed. *Id.*

**b. Eye Care**

On July 13, 2023, Johnson presented at sick call with complaints of blurry vision in his right eye. ECF No. 27-4 at 16–17. An eye exam was performed, and Johnson was unable to see out of right eye even with glasses. *Id.* On July 28, 2023, a consultation was placed for Johnson to be considered for surgery to remove the cataract in his right eye. *Id.* at 9. The consultation was

approved on August 12, 2023. *Id.* at 78. Johnson underwent surgery at University of Maryland Medical Center ("UMMC") on September 14, 2023, and was admitted to the JCI infirmary upon discharge from the hospital. ECF No. 27-3 at 714–16. He had a post-operative follow-up visit at UMMC on September 15, 2023, and, after that appointment, was discharged from the JCI infirmary back to general population. *Id.* at 698, 700.

On September 30, 2023, Johnson had a sick call visit for complaints of right eye pain. ECF No. 27-3 at 673–74. He was advised to complete a sick call slip to see the ophthalmologist. *Id.* Johnson returned to UMMC for another post-operative follow-up on October 20, 2023. No concerns were noted upon his return to the institution. *Id.* at 657. A consultation for consideration of left eye cataract surgery was placed that day. *Id.* at 630. The following day, nursing staff evaluated Johnson due to his complaints of left eye pain, gave him artificial tears, and educated him on how to use them. *Id.* at 647–48. On October 24, 2023, Johnson was seen for a pre-operative examination in advance of left eye cataract surgery, and x-rays of the chest were ordered. *Id.* at 639–45. However, on November 9, 2023, Utilization Management determined that, "based on the information provided[,] medical necessity [for cataract surgery was] not demonstrated at this time," because Johnson's left eye visual acuity was documented as 20/20; observation was recommended. *Id.* at 655.

On May 6, 2024, the onsite optometrist recommended a consultation for the ophthalmologist to evaluate Johnson. ECF No. 27-3 at 458. The consultation was placed on May 14, 2024. *Id.* at 448–57. On May 22, 2024, Johnson was scheduled for a medical appointment but did not appear. *Id.* at 447. Johnson received eyeglasses on June 6, 2024. *Id*. at 444. He had a chronic care visit on June 24, 2024, and his conditions were stable. *Id.* at 437–41.

On July 27, 2024, Johnson was seen due to his complaints that his eyeglasses caused a headache and dizziness, and he had the sensation of a foreign body in his right eye. ECF No. 27-3 at 416. An order was entered for his glasses to be remade, and he was advised to use artificial tears three times a day to address irritation. *Id.* at 416–19.

**c. Podiatry**

Johnson had a sick call visit on July 25, 2023, for complaints of, among other things, foot pain and a blister on his right toe. ECF No. 27-4 at 13. The nurse gave him ibuprofen and referred him to podiatry. *Id.* at 14.

Johnson had a chronic care visit on November 20, 2023. He reported difficulty walking due to his shoes being in disrepair. ECF No. 27-3 at 624. He was given bilateral heel injections for pain and ordered foot soaks two times a week for six months. *Id.* On December 2, 2023, Johnson did not appear for a scheduled medical appointment. *Id.* at 623. On December 8, 2023, Johnson asked to see a provider about a podiatrist referral to refit his shoe insole because the one he had was undersized. *Id.* at 621–22. He did not appear for scheduled medical appointments on December 11 and 21, 2023. *Id.* at 619–20. On January 21, 2024, a provider examined Johnson in response to his complaints of chronic foot pain and referred him to a podiatrist. *Id*. at 594. Johnson had a chronic care visit on February 22, 2024, his conditions were reviewed, and he was referred to podiatry again. *Id.* at 552–55.

On March 13, 2024, Johnson was scheduled for a procedure to remove symmetrical benign nevus from his foot, but the procedure was rescheduled because the proper medication was not on site. *Id.* at 539–40. Nursing staff saw Johnson on March 18, 2024, due to his complaint of foot pain and referred him to a provider. *Id.* at 535–36. On March 21, 2024, he underwent a right medial

heel nevus removal procedure. *Id*. at 525. He was advised the following day that the tissue removed was benign. *Id*. at 521.

Johnson was referred to podiatry on April 1, 2024. *Id*. at 508–12. On April 10, 2024, he had a follow-up visit regarding the junctional nevus removal procedure, and a consultation was issued for referral to Hanger for shoes. *Id.* at 479. On April 18, 2024, a nurse referred Johnson to a provider due to complaints of right foot pain. *Id.* at 469–70. Johnson had a chronic care visit on June 24, 2024, and his conditions were stable. *Id*. at 437–41.

Johnson visited medical on July 16, 2024. *Id*. at 421–34. He requested special shoes, and a consultation request was placed for orthopedist. *Id*.

### 2. Johnson's Medical Care under Centurion's Contract

#### a. Shoulder Injury

On August 22, 2024, Johnson had a sick call visit for complaints of shoulder pain and was referred to a provider. *Id.* at 402–03. On August 24, 2024, a provider saw Johnson for right shoulder pain, and an x-ray was ordered. *Id.* at 394–99. A provider saw him next for right shoulder pain on September 13, 2024, and Johnson reported moderate pain and asked to be evaluated by an orthopedist for joint injections. *Id.* at 385–91. The request for orthopedic consultation was denied on September 13, 2024, with a notation that it was unclear whether all conservative measures had been employed. *Id.* at 384.

A provider saw Johnson again for right shoulder pain on October 6, 2024, and Johnson requested a new wrist brace. *Id.* at 371. The provider recommended that Johnson be placed on light work duty and that he perform exercises, but he declined the exercise handout. *Id.* On October 29, 2024, Johnson reported during a chronic care visit that his pain was stable. *Id.* at 344. Johnson had

a nurse sick call visit for complaints of left shoulder pain on November 1, 2024, and it was noted that he was already seen for this complaint. *Id.* at 342–43.

A provider saw Johnson for his left shoulder pain on November 12, 2024, and it was recommended he continue his current pain medication regimen. *Id.* at 337. On November 26, 2024, Johnson signed a Release of Responsibility declining a scheduled physical. *Id.* at 323. A consultation request was generated on December 5, 2024, for further evaluation of Johnson's reported worsening bilateral shoulder pain. *Id.* at 316. On December 12, 2024, it was noted that the consultation request was denied because it was unclear whether all conservative measures had been tried, and it was recommended that x-rays be taken and home exercises and physical therapy explored. *Id.* at 321.

A provider saw Johnson on January 7, 2025, due to, among other things, complaints of shoulder pain, but Johnson reported that his concerns had been addressed. *Id.* at 301–04. He did not appear for a scheduled medical appointment on January 30, 2025. *Id.* at 300. On January 31, 2025, an administrative note was placed in his record indicating that his requested medication renewal was completed. *Id.* at 299. On February 20, 2024, Johnson declined to be seen for pain in his foot, shoulder, back, and neck. *Id.* at 288.

During a chronic care visit on April 4, 2025, Johnson reported that his shoulder pain was mild to moderate but was constant and worsening. *Id.* at 274. He had a provider visit for his shoulder and back pain on April 17, 2025, and was provided BioFreeze in addition to Neurontin. *Id.* at 265–71. On May 7, 2025, Johnson was seen again and advised to continue taking his pain medications, apply ice, and follow up with chronic care. *Id.* at 263–64. A physical therapy consultation was placed on May 10, 2025. *Id.* at 251–255. The request was approved on May 16, 2025. *Id.* at 256. On May 20, 2025, a provider saw Johnson to ensure all of his medications were

active and filled. *Id.* at 231. On June 11, 2025, a provider saw Johnson due to complaints of worsening shoulder pain that affected his sleep. *Id.* at 224.

The following day, Johnson was seen by the "pain panel," which recommended: (1) orthopedic consultation for possible steroid injection; (2) Celebrex 100 mg twice daily as needed; (3) fish oil 1000 mg twice daily; and (4) increased metformin to 1000 mg twice daily. *Id.* at 217. On the same day, he was seen for bilateral shoulder pain, and the consultation was placed for the orthopedic evaluation to consider steroid injections. *Id.* at 208–21. The recommendations of the pain panel were approved on June 16, 2025. *Id.* at 208. Johnson had a chronic care visit for left shoulder pain on July 22, 2025. *Id.* at 169. Johnson was reminded that he was referred to an orthopedist and his appointment was pending. *Id.* He did not express any other concerns. *Id.*

On August 11, 2025, an off-site orthopedic surgeon evaluated Johnson and diagnosed him as suffering from a rotator cuff tear in his left shoulder and rotator cuff tendinitis in the right shoulder. *Id.* at 162. Johnson was advised that MRIs of both shoulders should be obtained, and the left shoulder would require a rotator cuff repair. *Id.* The MRIs were ordered the same day and approved the following day. *Id.* at 160–61.

On September 18, 2025, a provider evaluated Johnson due to complaints of shoulder pain, and it was noted that his MRIs were upcoming and he had active prescriptions for pain medication. *Id.* at 137–41. On September 21 and 30, 2025, a provider saw him again due to complaints of chronic pain. *Id.* at 124–34. He was advised to follow up with orthopedics, undergo the MRIs, and continue his current medications, which included a recent increase in Neurontin. *Id.* On September 30, 2025, a shoulder brace was ordered for support and comfort. *Id.* at 123. On October 10, 2025, Johnson had an outpatient visit at Mercy Hospital for his MRIs. *Id.* at 115.

On October 14, 2025, Johnson was evaluated for physical therapy. *Id.* at 106–09. Given the planned surgery on Johnson's left shoulder, it was determined that physical therapy would be reevaluated after the operation. *Id.* at 106.

On October 22, 2025, PA Negussie reviewed Johnson's MRI results with him and placed a consultation for him to receive left rotator cuff repair surgery. *Id.* at 92–100. Johnson requested an update regarding his surgery on October 26, 2025, and was advised that the surgery was awaiting scheduling. *Id.* at 84.

Johnson underwent his pre-operative physical exam on November 7, 2025. *Id.* at 69–77. The surgery was conducted on November 13, 2025, and it was reported that Johnson tolerated the procedure well. *Id.* at 60, 66. Upon Johnson's return to the infirmary, a physician assistant noted that Johnson was to be provided an antibiotic and Tylenol #3 for pain relief. *Id.* at 66. On November 24, 2025, PA Negussie evaluated Johnson for wound care and removed the sutures in his left shoulder, and, because of redness noted around the wound, antibiotics were provided. *Id.* at 54–59. On November 26, 2025, Johnson requested he be cleared to return to work. *Id.* at 49. No signs of infection were noted, Johnson was cleared for light work duty as tolerated, and his prescription for Neurontin and Extra Strength Tylenol were continued. *Id.* at 53.

On December 8, 2025, a provider saw Johnson for wound care and a consultation ordered for six sessions of physical therapy for both shoulders. *Id.* at 39–44. A culture of the wound was taken, and Johnson was prescribed antibiotics and directed to return in one week. *Id.* at 44. A provider saw Johnson again for post-surgical wound care on December 12, 2025. *Id.* at 35. Johnson was instructed to clean the wound daily, leave it open to the air, finish the course of antibiotics, and return for reevaluation in a week. *Id.* That same day, PA Negussie conducted Johnson's

physical examination during which his chronic conditions were reviewed. His medications were renewed and adjusted as deemed appropriate. *Id.* at 26–29.

On December 19, 2025, a provider saw Johnson for wound care of the rotator cuff repair. *Id.* at 22. The wound was measured and assessed as has having light serous drainage with mild redness. *Id.* Daily dressing changes were ordered, a reevaluation was scheduled. *Id*. On December 22, 2025, Dr. Hill saw Johnson for a chronic care appointment and reviewed his medications. *Id.* at 17–21. He found that Johnson's chronic issues were stable and that he tolerated all medications. *Id.* Johnson's surgical site was improving, the wound had no drainage or bleeding, and he was awaiting the start of physical therapy. *Id.*

**b. Eye Care**

On November 16, 2024, a provider ordered new glasses for Johnson due to reported blurred vision. *Id.* at 332. The same day, the provider noted that the glasses came without tint and that Johnson wanted tint. *Id.* at 333. Johnson was not assessed as having a cataract in either eye. *Id.* at 335.

On February 7, 2025, new glasses were ordered for Johnson. *Id*. at 298. He was seen on April 17, 2025, and prescribed Occuvite with Lutein eye drops. *Id.* at 269–70. Johnson had an ophthalmology evaluation on May 10, 2025. *Id.* at 257–59. He complained that he could not see with his glasses and they gave him a headache. *Id*. at 257. He was advised that poor blood sugar control could change his prescription for corrective lenses. *Id*. New glasses were ordered. *Id*. at 259–61. There is no notation about Johnson having cataracts. *Id.*

On December 12, 2025, PA Negussie conducted a physical examination of Johnson, during which it was noted that his visual acuity was corrected to 20/20 and 20/25. *Id.* at 29.

**c. Podiatry**

On August 22, 2024, Johnson had a nurse sick call visit due to complaints of foot pain and referred to a provider. *Id*. at 402–03. He was approved for a podiatry evaluation on September 23, 2024. *Id*. at 378, 384. On December 18, 2024, Johnson visited Podiatry Associates in Columbia, Maryland and was prescribed Meloxicam. *Id*. at 311. On December 25, 2024, Johnson visited medical, reported side effects that he attributed to Meloxicam, and requested a different medication. *Id*. at 306–10. On February 20, 2025, Johnson declined to be seen for pain in his foot, shoulder, back, and neck. *Id.* at 288. On May 13, 2025, Johnson had a nurse sick call visit due to his complaint of a blister on his right heel, and he reported needing new insoles for his shoes. *Id.* at 249–50.

On May 16, 2025, Johnson complained of flat feet and that his half-length insole did not provide adequate comfort and support. *Id.* at 244. A full insole was ordered. *Id.* at 247. Johnson was seen on June 22, 2025, due to his complaint of foot pain. *Id*. at 199–202. It was determined that shoe insoles would be ordered, and Johnson was educated about that. *Id.* Johnson did not appear for a medical appointment on July 9, 2025. *Id*. at 191. The following day, Johnson was seen and sought permission to buy special sneakers, and permission was granted for him to buy the sneakers from a catalogue. *Id.* at 185. On July 14, 2025, a note was entered that Johnson received his special shoes and insoles. *Id.* at 181.

On August 2, 2025, Johnson had a nurse sick call visit due to his complaints of his "feet hurting and messing up his toes." *Id.* at 167–68. He was advised to remove his shoes for ten to fifteen minutes and adjust his shoelaces throughout the day as needed. *Id.* On August 17, 2025, Johnson was seen for bilateral foot pain. He was advised to continue his current pain medication, Neurontin. *Id.* at 152. He was seen again for complaints of foot pain on September 14, 2025, and Tylenol Extra Strength was ordered. *Id.* at 143–46. On October 26, 2025, Johnson requested new

tennis shoes, which were ordered. *Id.* at 83–84. On December 2, 2025, Johnson was advised that orthopedic shoes are only given out once a year and therefore his request for a second pair of shoes would not be filled, but he could purchase supportive shoes from the commissary. *Id.* at 48.

## II. PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL

In his Motions for Appointment of Counsel, Johnson states that his case is complicated and requires investigation, which he cannot perform due to his incarceration. ECF Nos. 14, 20, 30. He also states that issues of witness credibility are important and will require the assistance of counsel, as will the development of expert testimony. *Id*. Additionally, Johnson states that he needs an attorney because there are multiple defendants and the library at his place of incarceration has removed all phone books. ECF No. 29. He states that he has tried to hire an attorney but has been unsuccessful and that he will need help from an attorney in conducting discovery and addressing expert witnesses. *Id*. He also offers that he cannot afford to retain an attorney and his knowledge of the law is limited. *Id.*

A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is discretionary and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). There is no absolute right to appointment of counsel in a civil case; an indigent claimant must present "exceptional circumstances." *Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." *Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel). Exceptional circumstances may exist where a litigant "is barely able to read and write," *Whisenant*, 739 F.2d at 162, or clearly "has

a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008) (citing *Waller v. Butkovich*, 584 F. Supp. 909, 947 (M.D.N.C. 1984). "[A] district court must conduct a fact specific, two-part inquiry to assess whether a case presents exceptional circumstances before it decides whether to appoint counsel," including "whether the plaintiff has a colorable claim" and, "considering the claim's objective complexity and the plaintiff's subjective abilities, whether the plaintiff lacks the capacity to present it." *Jenkins v. Woodard*, 109 F.4th 242, 248 (4th Cir. 2024) (internal quotations omitted).

As explained in Part III *infra*, Johnson does not have a colorable claim. He has clearly demonstrated his ability to present relevant facts and to argue his case. His claim fails not because it is inartfully pleaded or argued, but because the facts of the case do not support a colorable claim. As such, Johnson's motions for appointment of counsel are denied.

## III. DEFENDANTS' DISPOSITIVE MOTIONS

State Defendants and Centurion Medical Defendants each assert that the Amended Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, that summary judgment should be granted in their favor pursuant to Rule 56. ECF Nos. 27, 40.

### A. Standard of Review

A motion to dismiss styled in the alternative as a motion for summary judgment implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where the plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–

61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Id.* at 261.

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A complaint need not include "detailed factual allegations," but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted). Furthermore, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 10 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up). And though district courts have a duty to construe self-represented pleadings liberally, a plaintiff must nevertheless allege facts that state a cause of action. *See Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir.1985) (duty to construe liberally does not require courts to conjure up questions never squarely presented).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255) (second alteration in original). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

Rule 56(d) requires "that summary judgment be denied when the nonmovant 'has not had the opportunity to discover information that is essential to his opposition." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (citation omitted); *see also* Fed. R. Civ. P. 56(d). "To obtain Rule 56(d) relief, the non-moving party must show how discovery 'could possibly create a genuine issue of material fact sufficient . . . to survive summary judgment, or otherwise affect the court's analysis.'" *Collington v. Maryland*, Civ. No. GJH-20-966, 2021 WL 3172275, at *7 (D. Md. July 26, 2021) (quoting *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015)). Generally, the non-moving party must make this showing "through the filing of a Rule 56(d) affidavit that outlines the need for discovery and what additional facts litigants hope to uncover through discovery to properly defeat summary judgment." *Dave & Buster's, Inc. v. White Flint*

*Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015); *see also* Fed. R. Civ. P. 56(d). Even without such an affidavit, however, a district court may not grant summary judgment "when it otherwise has 'fair notice of . . . potential dispute[s] as to the sufficiency of the summary judgment record.'" *Shaw v. Foreman*, 59 F.4th 121, 128 (4th Cir. 2023) (citation omitted).

The Court is mindful that Johnson is a self-represented litigant. A federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But liberal construction does not mean that a court can "ignore an obvious failure to allege facts setting forth a plausible claim for relief." *Sheehan v. Saoud*, 650 F. App'x 143, 152 (4th Cir. 2016) (citing *Weller v. Dep't of Social Servs.*, 901 F.2d 387, 391 (4th Cir. 1990)). The Court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

**B. Eleventh Amendment Immunity**

Under the Eleventh Amendment to the United States Constitution, a state and its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id*. (citing *Florida Department of Health v. Florida Nursing Home Assn.*, 450 U.S. 147 (1981) (per curiam)). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-201(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*,

465 U.S. at 100 (emphasis in original). Accordingly, Johnson's claims asserted against DPSCS Division of Correction, a state agency, may not proceed.

**C. Personal Participation**

In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply, and liability attaches only upon a defendant's personal participation in the constitutional violation. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc*., 195 F.3d 715, 727–28 (4th Cir. 1999); *Clark v. Md. Dep't of Pub. Safety and Correctional Servs.,* 316 Fed. Appx. 279, 282 (4th Cir. 2009).

To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;" (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Johnson does not allege any facts suggesting that any of the State Defendants were personally involved in the alleged constitutional violations. Other than naming them in the caption of the Complaint and in the list of Defendants, the Amended Complaint does not make any specific allegations against any of the State Defendants.

Moreover, to the extent Johnson seeks to hold any of the State Defendants liable because they processed grievances filed by Johnson, without more, receipt and processing of a grievance is insufficient to impose liability. *See Gallagher v. Shelton*, 587 F. 3d 1063, 1069 (10th Cir. 2009) (holding allegation that warden "rubber stamped" grievances was not enough to establish personal participation); *Prince v. Crabtree*, Civ. No. GLR-23-875, 2024 WL 1442193, at * 7 (D. Md. Apr. 3, 2024) ("Denial of a plaintiff's ARP requests and appeals alone is 'insufficient to establish personal participation in the alleged constitutional violations.'") (quoting *Whitington v. Ortiz*, 307 F. App'x 179, 193 (10th Cir. 2009)).

Johnson's claims are devoid of any allegation that the State Defendants were personally involved in his medical care or the allegedly retaliatory transfers between state prisons. Therefore, the State Defendants are entitled to dismissal of the Amended Complaint.[5]

**C. Plaintiff's Eighth Amendment Claims**

Johnson raises an Eighth Amendment claim regarding three aspects of his medical care: one in connection with the denial of cataract surgery on his right eye; the next based on the denial of constitutionally appropriate medical care for his shoulder; and the third for the denial of constitutionally adequate medical care for his flat feet.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976);

[5] Having so found, the Court need not address the State Defendants' additional arguments in support of their motion.

*see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the defendant prison official was aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994); *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

Centurion Medical Defendants present Johnson's medical records in support of their dispositive motion, while giving Johnson notice that the Court may treat their motion as one for

summary judgment. In response, Johnson does not provide any Rule 56(d) affidavit and does not make any showing or argument specifying a need for discovery to contest the evidence provided by Centurion Medical Defendants. Therefore, the Court finds that it may treat Centurion Medical Defendants' motion as one for summary judgment.

Johnson does not present any genuine dispute of material fact in opposition to Centurion Medical Defendants' motion. Specifically, Johnson fails to set forth sufficient evidence to demonstrate that any of the Centurion Medical Defendants knowingly failed to provide constitutionally adequate medical care for an objectively serious medical need or that they acted with deliberate indifference to that need. The medical records demonstrate that from the time Centurion Medical Defendants took over Johnson's medical care on August 1, 2024, he received constitutionally adequate medical care for each of his ailments.

Although the recommended left eye cataract surgery was denied in favor of continued observation, that denial occurred before Centurion took the contract to provide medical services at the facility, and there is simply no evidence in the record that, despite Johnson's vision being evaluated in April and May 2025, cataract surgery was then recommended. *See* ECF No. 27-3 at 257–59, 269–70.

Moreover, as to each of his complaints about medical care, the records demonstrate that Johnson received evaluations by a variety of medical personnel, including nursing staff, onsite providers, orthopedists, podiatrists, optometrists, ophthalmologists, physical therapists, and a "pain panel." He was provided diagnostic testing including x-rays, MRIs, and eye exams. Additionally, he was provided with analgesic medications and therapies to control his pain, including Neurontin, Meloxicam, Celebrex, topical analgesics, supplements, and ice baths. He was also provided assistive devices, including a shoulder brace, specialty insoles, shoes, and

eyeglasses. Ultimately, he underwent left rotator repair surgery followed by wound care and physical therapy.

Johnson provides no factual support for his bald claim that he was denied medical care due to costs. Instead, the record evidence demonstrates that he was consistently evaluated, his conditions monitored and specialty consultations were requested and provided. The record further demonstrates that Centurion Medical Defendants made significant efforts to address each of Johnson's medical issues and that none of the Centurion Medical Defendants were deliberately indifferent to his serious medical needs. They are entitled to summary judgment on his Eighth Amendment claims.

## IV. CONCLUSION

By separate Order, which follows, Centurion Medical Defendants' motion, treated as one for summary judgment, shall be granted and judgment will be entered in their favor. State Defendants' motion, treated as a motion to dismiss, will also be granted. Johnson's motions shall be denied.

August 31, 2026____
Date

_____/S/___________________
Matthew J. Maddox
United States District Judge